UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ERIKA SANTOS,

      Plaintiff,

v.                                      CASE NO. 6:25-cv-2167-PGB-LHP

RONALD HOWSE, EDGAR
FIGUEROA, WINSTON SCOTT,
BRUCE DEARDOFF, and KRISTINE
ZONKA, in their official capacities, and
DARLA FERGUSON, in her individual
and official capacities,

      Defendants.

_____/

## DEFENDANT DARLA FERGUSON'S MOTION TO DISMISS COUNT III OF PLAINTIFF'S COMPLAINT AND JURY TRIAL DEMAND AND INCORPORATED MEMORANDUM OF LAW

Defendant, Darla Ferguson, in her individual capacity ("Ferguson"), moves for entry of an Order dismissing Count III of Plaintiff's Complaint and Jury Trial Demand (Doc. 1 ("Complaint")), pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted as a matter of law, and in support thereof, states the following.

1.    Plaintiff, Erika Santos ("Santos"), initiated this action on November 12, 2025 when she filed her Complaint with the Court against Ronald Howse, Edgar Figueroa, Winston Scott, Bruce Deardoff, and Kristine Zonka, in their official

capacities (collectively, "Individual Board Defendants"), and Ferguson, in her individual and official capacities. *See* Doc. 1.

2.     In the Complaint, Santos alleges three causes of action: (1) Count I – First Amendment retaliation against the Individual Board Defendants in their official capacity and Ferguson in her official capacity; (2) Count II – First Amendment content and viewpoint discrimination against the Individual Board Defendants in their official capacity and Ferguson in her official capacity; and (3) Count III – First Amendment content and viewpoint discrimination against Ferguson in her individual capacity.

3.     Count III against Ferguson in her individual capacity is subject to dismissal for failure to state a claim upon which relief can be granted.[1]

4.     Specifically, Count III is due to be dismissed with prejudice because Ferguson is entitled to qualified immunity for the claim raised against her in her individual capacity.

5.     **<u>Local Rule 3.01(g) Certification</u>** - Pursuant to Local Rule 3.01(g), Ferguson's counsel has conferred via phone and email with Santos' counsel regarding

---

[1] This Motion only responds to Count III of the Complaint.  It appears that Santos recognizes the limitations on the relief that she can seek against the Individual Board Defendants and Ferguson in their official capacities—i.e., that she cannot seek, and thus has not in the Complaint sought, money damages from the Individual Board Defendants and Ferguson in their official capacities.  *See Spilker v. Eastern Fla. State Coll.*, No. 6:19-cv-2206-Orl-41DCI, 2020 WL 1172132, at *2 (M.D. Fla. Feb. 11, 2020) ("The Eleventh Amendment is an absolute bar to a § 1983 suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities."), *report and recommendation adopted by* 2020 WL 1170832 (M.D. Fla. Mar. 11, 2020).  Thus, the Individual Board Defendants and Ferguson in their official capacities will be responding separately to Counts I and II of the Complaint.

the substance of this Motion, and Santos' counsel has indicated that Santos opposes the requested relief.

WHEREFORE, Ferguson respectfully requests that the Court grant this Motion and enter an Order dismissing Count III of the Complaint with prejudice and granting any other relief this Court deems appropriate.

## MEMORANDUM OF LAW

## I.    LEGAL STANDARD FOR MOTIONS TO DISMISS.

Rule 12(b)(6) authorizes a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Accordingly, to sufficiently plead a claim, a plaintiff must allege sufficient facts that plausibly establish each element of the cause of action. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

A court may dismiss a claim when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.  *See Day v. Taylor*, 400 F.3d 1272, 1275 (11th Cir. 2005).  "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the Plaintiff's complaint to determine whether it sets forth sufficient allegations to establish a claim for relief." *Ball v. Heilig-Meyers Furniture Co.*, 35 F. Supp. 2d 1371, 1372 (M.D. Fla. 1999).  A complaint should be dismissed when "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Id.* at 1373 (quoting *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).  "[W]hen no construction of the facts can produce a cause of action as to a dispositive issue of law, dismissal is appropriate."  *Id.*

3

While a complaint does not need detailed factual allegations to withstand a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alteration omitted). A plaintiff must plead sufficient facts "to raise a right to relief above the speculative level." *Id.* This requires a plaintiff to allege sufficient factual matter, which if accepted as true, states a claim for relief that is "'plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## II.    <u>RELEVANT ALLEGATIONS IN THE COMPLAINT.</u>

Following the public shooting of Charlie Kirk ("Kirk"), Santos, who at the time was employed by Eastern Florida State College ("College"), made several comments on her Facebook page on September 10, 2025[2] about the shooting. Doc. 1 at ¶¶ 7, 13–25; Doc. 1-1 at pp. 2–8[3]. After one of Santos' co-workers, Shauna Thomas

---

[2] Unless otherwise stated, all dates referenced in this Motion are to 2025.

[3] When ruling on this Motion, the Court can consider the exhibits that Santos attached to the Complaint, and if the allegations in the Complaint conflict with the contents of the exhibit, the exhibit controls. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007).

("Thomas"), commented on Facebook that it was almost like Kirk's words were "coming back to haunt him and I love that for him," Santos responded by stating "[i]t really is some crazy irony. It's very telling about the vibes one puts out into the world." Doc. 1 at ¶¶ 18–19; Doc. 1-1 at pp. 7–8. Santos then shared a post from the Feminist News on her Facebook page, which included text stating that "[l]et's make one thing clear form the start: Charlie Kirk was the victim of a shooting in a country where he, along with other right-wing extremist influencers, have been inciting violence for years. Kirk is neither a martyr nor a hero; he is a cause." Doc. 1 at ¶¶ 21–22; Doc. 1-1 at p. 4. In sharing this post on her Facebook page, Santos added the following comment: "Ten toes down [shrug emoji] feel free to delete meeeeeee [okay hand emoji]." Doc. 1 at ¶ 21; Doc. 1-1 at p. 4.

On September 18, the College's Human Resources department received an anonymous letter, which was addressed to Ferguson, who is the College's Associate Vice President of Human Resources, and enclosed the screenshots of Santos' Facebook posts and comments about the shooting of Kirk. Doc. 1 at ¶ 26; Doc. 1-1. The letter stated the following:

> Darla,
>
> Enclosed you will find screenshots of two Facebook accounts of current EFSC employees. These screenshots show vile and disgraceful comments made by these individuals regarding the heartless assassination of Charlie Kirk. The comments, made publicly and with EFSC identified in their profiles, reflect poorly on the College and it's [sic] leadership and are unacceptable.

> Such behavior raises serious concerns about the professionalism and judgement of employees representing EFSC. We urge you to address this matter promptly. If no action is taken, it will appear that this type of conduct is tolerated at the College, which could damage EFSC's reputation.
>
> We trust that EFSC holds itself to a higher standard then [sic] the disgusting comments of Erika Santos and Shauna Thomas and hope this situation is resolved promptly. If not, this will go much higher than you and Dr. Richey. We hope that the College is not a deplorable as these two individuals.

Doc. 1-1 at p. 1. Following the College's receipt of this letter, the College suspended Santos pending an investigation of her Facebook posts and comments. Doc. 1 at ¶ 27; Doc. 1-2.

On September 23, Sergeant Ricky Carswell ("Sergeant Carswell"), of the College's Security department, submitted a memorandum to Ferguson summarizing his findings of Santos' Facebook posts and comments. Doc. 1 at ¶ 28; Doc. 1-3. Sergeant Carswell concluded that Santos' and Thomas' "posts and comments do appear to be disgraceful in that they give the appearance of condoning the assassination of Charlie Kirk." Doc. 1 at ¶ 30; Doc. 1-3 at p. 2.

After receiving Sergeant Carswell's findings and conclusions, Ferguson, along with the College's Chief of Security, met with Santos on September 24 to discuss the situation. Doc. 1-4 at p. 1. On October 1, Ferguson requested that Santos provide Ferguson with any information, on or before October 9, that Santos wanted the College to consider as part of its investigation. Doc. 1-4 at p. 1. Santos failed to provide Ferguson with any information. Doc. 1-4 at p. 1.

6

After reviewing the anonymous letter containing Santos' Facebook posts and comments, meeting with Santos, reviewing Sergeant Carswell's memorandum, requesting information from Santos, and reviewing Santos' personnel file, Ferguson, on October 15, issued a memorandum detailing the findings of the investigation completed by the College.  Doc. 1 at ¶ 31; Doc. 1-4.  In the memorandum, Ferguson stated that "Santos admitted to posting the comments contained in the anonymous letter on Facebook.  When asked the reason for posting the comments, Santos stated that she didn't like the rhetoric coming out of his mouth, referring to Charlie Kirk."  Doc. 1-4 at p. 1.  Ferguson found that Santos' explanation for her "ten toes down" comment was

> unpersuasive, and it is more likely that "ten toes down" in this context was condoning if not celebrating Charlie Kirk's death.  This interpretation is bolstered by Josh Torgusen ["Torgusen"], someone apparently on Facebook who saw and interpreted the "ten toes down" comment similarly, and wrote the following comment in response:
>
> "Just know that it's disgusting for you, as a parent, to have this posted.  He was a father.  A son.  Just cause you don't agree doesn't mean this should happen.  Hope you find Jesus cause man that's crazy."

Doc. 1-4 at p. 2.  As a result, Ferguson concluded that "this investigation revealed that Erika Santos participated in the Facebook activity contained in the anonymous letter received by the Human Resources office on September 18, 2025, in which Santos appears to condone if not celebrate the death of Charlie Kirk."  Doc. 1 at ¶ 31; Doc. 1-4 at p. 4.

Following the conclusion of the investigation, the College terminated Santos'
employment on October 16.  Doc. 1 at ¶ 32; Doc. 1-5.  Although Ferguson signed the
termination letter on behalf of the College, the letter makes clear that the decision to
terminate Santos' employment was made by the College's "Administration."  Doc. 1-
5 at p. 2 ("Considering the above, the Administration has determined that you are
hereby terminated effective this date.").  The termination letter explained that Santos
does "have First Amendment rights just like anyone else, provided the exercise of
those rights does not impede EFSC's ability to effectively and efficiently execute its
responsibilities as a public institution of higher education in Brevard County, Florida."
Doc. 1-5 at p. 1.  The Administration focused on the fact that the author of the
anonymous letter, likely someone from the College's local community, found Santos'
comments to be "vile and disgraceful," while "reflect[ing] poorly on the College and
its leadership and . . . rais[ing] serious concerns about the professionalism and
judgement of employees representing EFSC."  Doc. 1-5 at p. 1 (internal quotation
marks and emphasis omitted).  Additionally, the Administration highlighted that

> [i]n today's world, for an EFSC employee to condone or
> celebrate an act of gun violence occurring on a college
> campus anywhere in this country is simply unfathomable
> and further undermines public confidence in EFSC's ability
> to provide a safe learning and working environment, which
> again, impedes EFSC's ability to fulfill its mission.

Doc. 1-5 at p. 2.

## III.  COUNT III SHOULD BE DISMISSED WITH PREJUDICE BECAUSE FERGUSON IS ENTITLED TO QUALIFIED IMMUNITY.

### A.  *Legal Standard for an Employee's First Amendment Claim.*

"[A] public employee's First Amendment rights are not absolute." *Labriola v. Miami-Dade Cty.*, 142 F.4th 1305, 1309 (11th Cir. 2025).  Courts use a four-factor test, derived from the Supreme Court's *Pickering* and *Connick* decisions,[4] to determine whether a government employer impermissibly burdened an employee's speech under the First Amendment.  *See id.*  Specifically, in order to prevail on a First Amendment claim, an employee must first establish the following three elements: "(1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action." *Id.* (internal quotation marks omitted).  If the employee "satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech."  *Id.* (internal quotation marks and alteration omitted).

### B.  *Legal Standard for Qualified Immunity.*

The claim against Ferguson in her individual capacity should be dismissed on the basis of qualified immunity.  It is well-settled that "[q]ualified immunity 'shields

---

[4] *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Crocker v. Beatty*, 995 F.3d 1232, 1239 (11th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "[B]ecause qualified immunity is 'an *immunity from suit* rather than a mere defense to liability,' the applicability of qualified immunity is a threshold question that courts must decide at the earliest possible stage of the litigation." *Cox v. McCraley*, 993 F. Supp. 1452, 1457 (M.D. Fla. 1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal citation omitted).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The purpose of qualified immunity is to provide "government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (internal quotation marks omitted). The Eleventh Circuit has held that "[f]or qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel, (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1270, 1275 (11th Cir. 2000) (district court properly dismissed First Amendment claim on the basis of qualified immunity).

As further recognized by the Eleventh Circuit, and specifically relevant to this case, "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *See Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir.

10

2017). "Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the *inevitable* conclusion that the discharge of the employee was unlawful." *Dartland v. Metro. Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989) (emphasis added); *see also Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1298 (11th Cir. 2000) (internal quotation marks omitted) (noting that Eleventh Circuit "decisions tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated clearly established federal rights").

To be qualifiedly immune, an individually named defendant must first establish that she was acting within her discretionary authority when the alleged wrongful acts occurred. *Crocker*, 995 F.3d at 1239. An individual acts within the purview of her discretionary authority when her actions "(1) were undertaken pursuant to the performance of [her] duties, and (2) were within the scope of [her] authority.'" *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (internal quotation marks omitted).

If the defendant establishes that she acted within her discretionary authority, it then becomes the plaintiff's burden to demonstrate qualified immunity is not appropriate by showing that the defendant violated the plaintiff's constitutional rights and that the violated right was clearly established during the time of the alleged misconduct. *Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1344 (11th Cir. 2016). When determining "whether the law clearly established the relevant conduct as a

constitutional violation at the time that [the defendants] engaged in the challenged acts," courts look to whether the defendants had fair warning that their conduct violated a constitutional right. *Jones*, 857 F.3d at 851; *see also Zedalis v. Darnell*, No. 1:17-cv-113-MW-GRJ, 2019 WL 12061189, at *1 (N.D. Fla. July 30, 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal alterations omitted) ("A right is clearly established only if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"). There are three methods to establish a government official had fair warning such that a plaintiff can overcome the official's entitlement to qualified immunity:

> *First*, the plaintiffs may show that a materially similar case has already been decided. *Second*, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the relevant State Supreme Court.

*Gaines*, 871 F.3d at 1208 (internal alterations omitted); *see also Griffin Indus.*, 496 F.3d at 1208–09.

Critically, the Supreme Court has recognized the importance of qualified immunity as applied to government officials and has directed lower courts not to apply the "clearly established" test too rigorously against government officials:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is

> effectively lost if a case is erroneously permitted to go to trial.
>
> Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*See White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citations, quotation marks, and alterations omitted); *see also Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001) (internal quotation marks omitted) ("A plaintiff cannot avoid the qualified immunity defense by referring to general rules and to the violation of abstract rights.").

Here, Ferguson is entitled to qualified immunity, as a matter of law, on the claim raised against her in her individual capacity. As to the first prong of the analysis, it is without dispute—based on Santos' allegations alone—that Ferguson acted within her discretionary authority at all relevant times. *See* Doc. 1 at ¶ 9 ("Ferguson was the EFSC official who suspended and later terminated Plaintiff, acting under color of state law . . . ."); Doc. 1 at ¶ 10 ("At all relevant times, Defendants were state actors exercising authority under Florida statutes, regulations, and institutional policies."). At no time does Santos allege that Ferguson was acting outside the scope of her authority. Indeed, Ferguson is accused of suspending and terminating Santos after conducting an investigation into Santos' social media posts. *See* Doc. 1 at ¶¶ 9, 58. These alleged actions fall squarely within Ferguson's discretionary authority as the College's Associate Vice President for Human Resources.

13

Thus, the burden to defeat qualified immunity is squarely on Santos to demonstrate that qualified immunity is not appropriate.  *See Jacoby*, 835 F.3d at 1344. For purposes of this Motion only, Ferguson will not dispute that the Complaint sufficiently alleges a violation of Santos' First Amendment rights.[5]    However, Ferguson is entitled to qualified immunity because the Complaint does not plausibly establish that Santos' violated right was clearly established during the time of the alleged misconduct.[6]

### C.    *The "Clearly Established" Prong.*

In addressing the "clearly established" prong of the qualified immunity analysis, the relevant question is whether Ferguson could have reasonably believed that at the time that she terminated Santos that she could have taken such act on account of Santos' comments about Kirk.  *See Lane*, 573 U.S. at 243.  Fatal to Santos' attempt to defeat qualified immunity, a reasonable official in the position of Ferguson could consider Santos' comments and determine that terminating Santos would be permissible under Eleventh Circuit precedent.  Thus, Ferguson's conduct did not violate clearly established law.

Santos cannot succeed under any of the three methods in showing that Ferguson had fair warning to know that her conduct violated Santos' First Amendment rights.

---

[5] While Ferguson certainly contests the existence of a First Amendment violation, she recognizes this argument is not well suited for a motion to dismiss.

[6] The Court has discretion to decide the order in which to resolve these two inquiries—specifically, whether a constitutional violation was sufficiently pled and whether such violation was of a right that was clearly established under the law.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

14

Initially, Santos cannot point to any case law that "has . . . staked out a bright line" as to whether Ferguson could terminate Santos on account of Santos' comments about Kirk. *See Gaines*, 871 F.3d at 1210 (internal quotation marks omitted) (government official does not have fair warning under the first method and "qualified immunity almost always protects the defendant" unless the "case law, in factual terms, has . . . staked out a bright line"). Additionally, "because there are no broad principles in case law clearly establishing that every reasonable official in [Ferguson's] situation would know that the challenged conduct would violate [Santos'] First Amendment rights, this is not one of the rare and exceptional 'obvious clarity' cases" showing that Ferguson had fair warning under the second or third methods. *See id.* at 1209 (recognizing that "[c]ases do not often arise under the second and third methods" that would defeat qualified immunity); *see also Franklin v. Popovich*, No. 6:21-cv-383-PGB-DCI, 2022 WL 4464795, at *8 (M.D. Fla. Sept. 26, 2022) (Byron, J.) (internal quotation marks and citation omitted) ("For that reason, the second and third paths are rarely-trod ones. Thus, when a plaintiff relies on a general rule to argue that the law is clearly established, that law must clearly and obviously apply to the circumstances at hand.").

The second step of a First Amendment claim under the *Pickering-Connick* test—namely, the *Pickering* balancing between the employee's free speech interests and the employer's interest in effective and efficient fulfillment of its responsibilities—further shows that Ferguson did not violate any clearly established right that Santos had under the First Amendment. When considering this prong of the First Amendment analysis,

courts consider several factors, including "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Labriola*, 142 F.4th at 1309 (internal quotation marks omitted). Here, the allegations in the Complaint and the exhibits attached to the Complaint show that Santos' interest in her speech is limited[7] while the College's interests were affected by Santos' speech.

First, relevant to the manner of Santos' speech, "[i]f the manner and content of an employee's speech is disrespectful, demeaning, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." *See id.* at 1311; *see also Dartland*, 866 F.2d at 1324 ("The manner of Dartland's message was rude and insulting. Although Dartland possessed a constitutional interest in expressing his view on a matter of public importance, the insulting nature of his words gives his speech an element of personal as opposed to public interest."). According to the exhibits attached to the Complaint, at least three individuals found that Santos' speech met this standard. *See* Doc. 1-1 at p. 1 (anonymous author of the letter referring to the speech as "vile and disgraceful" and "disgusting"); Doc. 1-1 at p. 5 (Torgusen referring to the speech as "disgusting"); Doc. 1-3 at p. 2 (Sergeant Carswell referring to the speech as "disgraceful").

---

[7] To be clear, Ferguson is not arguing in the Motion that Santos' speech does not meet the first prong of the *Pickering-Connick* test—specifically, that the speech was on a matter of public concern. Rather, Ferguson here is addressing the content of Santos' speech to determine how much weight should be given to Santos' speech under the second prong of the test—namely, the *Pickering* balance of interests between Santos and the College.

Second, the speech to which Santos engaged on Facebook was not political speech. As recently explained by a federal district court in Tennessee in a lawsuit filed by an employee who was placed on administrative leave following a social media post about the shooting of Kirk, "Plaintiff's comment did not specifically engage with Charlie Kirk's politics or his political message. Because the content of Plaintiff's speech was not core political speech, her speech does not occupy 'the highest rung of the hierarchy of First Amendment' protection." *See Shirinian v. Plowman*, No. 3:25-cv-528-KAC-JEM, 2025 WL 3680503, at *3 (E.D. Tenn. Dec. 18, 2025) (quoting *Connick*, 461 U.S. at 145). Similarly, Santos' Facebook posts and comments related to her views on the shooting of Kirk "fall[] outside of the First Amendment's core because it is not political speech." *See id.* Thus, Santos' speech is not entitled to the greatest protection under the First Amendment, further establishing that it was not clearly established that she could not be terminated for publicly posting her views on the shooting of Kirk.

Third, the College did not immediately terminate Santos upon becoming aware of her comments. Rather, the College conducted an investigation that included at least two officials (Sergeant Carswell and Ferguson) and did not terminate Santos until the conclusion of the investigation, which was nearly one month after the College received notice of Santos' comments. *See* Doc. 1 at ¶¶ 26, 28, 31, 32; Docs. 1-3, 1-4, 1-5. The College's decision to terminate Santos' employment was made only after the College's investigation revealed that Santos' "comments impeded EFSC's ability to fulfill its mission" and "undermine[d] public confidence in EFSC's ability to provide a safe learning and working environment." *See* Doc. 1-5 at p. 2. The College's

17

determinations are supported by the letter that the College received, which threatened reputational damage to the College if it did not address Santos' Facebook comments as "[t]he comments . . . reflect poorly on the College and it's [sic] leadership" and "raise[] serious concerns about the professionalism and judgement of employees representing EFSC." *See* Doc. 1-1 at p. 1.

Thus, when weighing Santos' limited interest in her speech with the College's interest in "effectively and efficiently execut[ing] its responsibilities as a public institution of higher education in Brevard County, Florida" (*see* Doc. 1-5 at p. 1), it is clear, as a matter of law, that Santos did not have a clearly established First Amendment right to not be terminated as a result of her comments in which she shared her views about the shooting of Kirk.

While some courts, including this Court, have deferred ruling on the *Pickering* balancing of interests as related to qualified immunity until summary judgment, those decisions rely on the fact that the "Complaint is devoid of allegations that the [speech] impacted" the defendant's operations. *See McCullars v. Maloy*, No. 6:17-cv-1587-Orl-40GJK, 2018 WL 1583639, at *4–5 (M.D. Fla. Apr. 2, 2018) (Byron, J.) (finding that the plaintiff "has met his burden of pleading that Maloy's conduct was proscribed by clearly established law" because "the allegations of the Complaint do not reveal any government interest affected by the [speech]"); *see also Brown v. Young*, No. 4:25-cv-419-MW/MJF, 2025 WL 3640389, at *2 (N.D. Fla. Dec. 16, 2025) (denying motion to dismiss for qualified immunity because the *Pickering* balance cannot be made at the pleading stage as the complaint does not include any allegations about the speech's

18

effect on the employer).  As a result, these courts, including this Court, have denied a motion to dismiss on the basis of qualified immunity because the defendant's "arguments . . . invoke facts outside of the Complaint, and are therefore premature at this stage of the proceedings."  *See McCullars*, 2018 WL 1583639, at *4.

Here, however, Santos has attached multiple exhibits to the Complaint identifying how Santos' comments impacted the College, which provide the Court, at the motion to dismiss stage, with the College's justifications for Santos' termination. *See* Doc. 1-4 at p. 3 (Ferguson noting the letter to the College referred to Santos' comments as "disgusting" and "deplorable," while also demanding the College address the matter); Doc. 1-5 at p. 2 (Santos' termination letter stating that her "comments impeded EFSC's ability to fulfill its mission" and "undermine[d] public confidence in EFSC's ability to provide a safe learning and working environment"). In other words, "[t]he government's side of the *Pickering* balance is [not] empty" at the motion to dismiss stage.  *See McCullars*, 2018 WL 1583639, at *4.  Notably, Ferguson does not need to establish that the *Pickering* balance will definitively favor her as a matter of law—rather, for purposes of qualified immunity, she only needs to establish that "the outcome of the *Pickering* balance is anything but inevitable."  *See McCullars v. Maloy*, No. 6:17-cv-1587-Orl-40GJK, 2018 WL 6618536, at *7, 8 (M.D. Fla. Dec. 18, 2018) (Byron, J.) (internal quotation marks omitted) (finding that qualified immunity was appropriate because "it is unclear whose interests are more robust" under the *Pickering* balance, which shows that "Defendant's actions did not violate clearly established law"), *clarified on other grounds by* 2019 WL 130363 (M.D. Fla. Jan. 8,

19

2019).  Accordingly, the qualified immunity analysis is ripe for the Court to decide in this Motion and the allegations in the Complaint—by virtue of the exhibits attached to the Complaint—show that Ferguson's conduct was not proscribed by clearly established law.

Tellingly, Santos does not even attempt to plead facts to meet the "clearly established" standard, likely because it is impossible.  Rather, Santos resorts to a bare recitation of the elements by claiming that her "rights violated were clearly established at the time of Ferguson's actions.  A reasonable official in [Ferguson's] position would have known that firing an employee for private political speech on a matter of public concern violates the First Amendment."  *See* Doc. 1 at ¶ 61.  Such conclusory allegations are insufficient to defeat qualified immunity.  *See Hull v. Bri Sharky's, LLC*, No. 5:14-cv-135-RS-CJK, 2014 WL 5772020, at *2–3 (N.D. Fla. Nov. 5, 2014) (dismissing claim because the plaintiff failed to include "any other factual circumstances beyond a bare recitation of the elements" of her claim).

Additionally, Santos' framing of the issue misconstrues the law both factually and legally.  Contrary to Santos' assertion, as discussed above, Santos' speech was not political speech.  Further, Santos' attempt to show that Ferguson is not entitled to qualified immunity misapprehends the proper legal question.  Santos views the relevant inquiry as whether "[a] reasonable official in [Ferguson's] position would have known that firing an employee for private political speech on a matter of public concern violates the First Amendment."  *See* Doc. 1 at ¶ 61.  This view of the issue is contrary to the applicable law on qualified immunity as it is far too general and broad.

Ferguson does not dispute that employees have a clearly established First Amendment right not to be terminated in retaliation for exercising their First Amendment rights. But the pertinent qualified immunity inquiry does not end there. Otherwise, if the inquiry did end there, government officials would never be able to successfully invoke the qualified immunity defense in response to a First Amendment claim, which would erode the defense and be contrary to Eleventh Circuit precedent recognizing that "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *See Gaines*, 871 F.3d at 1210.

Rather, the qualified immunity inquiry is more nuanced and needs to be addressed more specifically than endorsed by Santos. Specifically, the relevant question to be addressed by the Court is whether a reasonable government official standing in the shoes of Ferguson would have been on notice that she was violating Santos' First Amendment rights when Santos was terminated following her public comments about the shooting of Kirk. Based on the above considerations, and the fact that more than 600 individuals in the United States were fired, suspended, placed under investigation, or disciplined by employers for comments relating to the shooting of Kirk,[8] Ferguson was not, as a matter of law, on such notice. The sheer number of other individuals who were disciplined by other employers confirms the absence of

---

[8] *See* R. Satter and A. Vicens, *The Charlie Kirk Purge: How 600 Americans Were Punished in a Pro-Trump Crackdown*, REUTERS (Nov. 19, 2025), https://www.reuters.com/investigations/charlie-kirk-purge-how-600-americans-were-punished-pro-trump-crackdown-2025-11-19/ (last visited Dec. 29, 2025).

clearly established law as no reasonable government official could have known that the First Amendment forbade the College's response to Santos' comments.

Ferguson's view of the relevant inquiry is consistent with guidance from the Supreme Court. In addressing the application of qualified immunity as to a claim resulting from a warrantless search of a residence, the Court stated that

> [t]he operation of this [clearly established] standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties, by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages.

*Anderson*, 483 U.S. at 639 (internal quotation marks and alteration omitted)[9]; *see also*

*Griffin Indus.*, 496 F.3d at 1209 (defendants were not provided with fair warning under

---

[9] Although *Anderson* involved an alleged violation of the Fourth Amendment and not the First Amendment, any "attempt [by Santos] to distinguish [*Anderson*] fails because both this case and the

the circumstances of a clearly established right because "[u]nder well-established qualified immunity doctrine, the Fourteenth Amendment's broad command that no state shall 'deny to any person within its jurisdiction the equal protection of the laws' may, as it does here, simply operate at too high a level of generality"); *Hansen v. Soldenwagner*, 19 F.3d 573, 575 (11th Cir. 1994) ("The question before us is not whether, in general, public employees enjoy some freedom under the First Amendment to speak on matters of public concern; they do. . . .  Here, as in all qualified immunity cases, the question is fact specific . . . ."); *Franklin*, 2022 WL 4464795, at *8 (government official entitled to qualified immunity as "Plaintiff's allegation that Defendant violated Decedent's Fourth Amendment 'right to be free from excessive use of force' fails on this count because it describes Decedent's rights at too high a level of generality").

In *Anderson*, the Court concluded that the appellate court "misapplied" the principles of qualified immunity because its

> brief discussion of qualified immunity consisted of little more than an assertion that a general right Anderson was alleged to have violated—the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established. The Court of Appeals specifically refused to consider the argument that it was *not* clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances. The previous discussion should make clear that this refusal was erroneous. It simply does not follow immediately from the

---

[*Anderson*] case involve a government official attempting to claim qualified immunity—the specific basis for the federal cause of action is immaterial."  *See Franklin*, 2022 WL 4464795, at *4.

> conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Anderson*, 483 U.S. at 640–41.   Similarly, here, "[i]t simply does not follow immediately from the conclusion that it was firmly established" that employees have a right not to be terminated in retaliation for exercising their First Amendment rights, that the decision to terminate Santos was "objectively legally unreasonable." *See id.* at 641.

In short, holding Ferguson "liable 'would destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties, by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages.'" *See Griffin Indus.*, 496 F.3d at 1210 (quoting *Anderson*, 483 U.S. at 639).   Thus, as existing precedent did not place the constitutional question of whether Ferguson violated Santos' First Amendment rights "beyond debate," the individual capacity claim raised by Santos against Ferguson in Count III should be dismissed with prejudice due to qualified immunity. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7–8 (2021) (internal quotation marks omitted).

24

IV. **CONCLUSION.**

Based upon the foregoing and because no amendment could establish that Ferguson is not entitled to qualified immunity, Ferguson respectfully requests that the Court grant this Motion and enter an Order dismissing Count III of the Complaint with prejudice.

January 9, 2026

Respectfully submitted,

*/s/ Mark E. Levitt*
Mark E. Levitt, Esq.
Florida Bar No. 193190
Howard M. Waldman, Esq.
Florida Bar No. 1002881
FordHarrison LLP
300 South Orange Ave., Suite 1300
Orlando, FL 32801
(407) 418-2300
mlevitt@fordharrison.com
hwaldman@fordharrison.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 9, 2026 a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF, which will send a notice of electronic filing to the following: Ryan D. Barack and Michelle Erin Nadeau at rbarack@employeerights.com, jackie@employeerights.com, and mnadeau@employeerights.com; Michelle Morton, Caroline A. McNamara, Samantha J. Past, and Daniel B. Tilley at mmorton@aclufl.org, cmcnamara@aclufl.org, spast@aclusfl.org, and dtilley@aclufl.org.

*/s/ Mark E. Levitt*
Attorney