UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ERIKA SANTOS**,

     Plaintiff,

Case No. 6:25-cv-02167-PGB-LHP

vs.

**RONALD HOWSE, et al.**

     Defendants.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT DARLA FERGUSON'S MOTION TO DISMISS

Plaintiff Erika Santos responds in opposition to Defendant's Motion to Dismiss Count III of Plaintiff's Complaint and Jury Trial Demand (Dkt. No. 16) ("Motion").

Santos asserts three causes of action in her Complaint: (I) First Amendment retaliation against members of the Eastern Florida State College ("EFSC") Board of Trustees and Darla Ferguson in their official capacities; (II) First Amendment content and viewpoint discrimination against members of EFSC and Ferguson in their official capacities; and (III) First Amendment content and viewpoint discrimination against Ferguson in her individual capacity. These claims arise from Defendants' retaliatory and discriminatory actions in response to Santos's political commentary on her private social media account regarding the death of Charlie Kirk, a well-known public figure and political activist.

Defendant's Motion seeks to dismiss Count III against Ferguson in her individual capacity with prejudice, alleging Ferguson is entitled to qualified immunity. Because Ferguson had fair notice that terminating Santos based on disapproval of her personal political speech violated Santos's First Amendment rights, the Motion must be denied. Furthermore, as is often the case at the motion to dismiss stage, the record does not support a finding that the EFSC's interests outweighed Santos's First Amendment rights as a matter of law. If the Court determines otherwise, dismissal with prejudice is inappropriate, as leave to amend pleadings should be given freely when justice requires. Fed. R. Civ. P. 15(a)(2).

In reviewing the Motion, the Court is limited to the allegations in the Complaint, which it must accept as true and construe in the light most favorable to Santos. These facts demonstrate that Santos was terminated because Ferguson and EFSC disagreed with her viewpoint on a matter of public concern. The only allegations cited in the Motion as evidence that Santos's speech had an impact on EFSC's interest in effective and efficient fulfillment of its responsibilities are legally insufficient to justify Ferguson's decision to terminate Santos under clearly established law. Thus, *Pickering* balancing tilts decidedly in favor of Santos. To the extent there is a factual dispute as to any impact of Santos's speech on EFSC's interests, that is better resolved after discovery.

The Complaint contains more than sufficient facts demonstrating that Defendant acted in violation of clearly established law to retaliate against Plaintiff because of her constitutionally protected speech. Santos has not only stated a cause

of action, but she will also ultimately succeed on the merits of her claim.

### STATEMENT OF THE FACTS

Santos, an EFSC alumni and employee, was employed by EFSC for more than four years, collectively. At the time of her termination, Santos was serving as a grant accountant in EFSC's Accounting Office, providing accounting services in support of post-award grant compliance. Dkt. No. 1 ¶ 7. She was not in a policymaking or public relations role. *Id.*

On September 10, 2025, as news of political figure Charlie Kirk's killing spread, the public debated his legacy. Santos expressed her views on this controversial topic on her private Facebook page. *Id.* ¶ 13. Specifically, Santos reposted an announcement of Kirk's shooting alongside a quote attributed to Kirk, stating "If I had a 10-year-old daughter who was sexually assaulted and became pregnant as a result, I would force her to carry the pregnancy to term." Santos added, "Imma just shut up now…" *Id.* ¶ 15.

In response to Santos's post, her co-worker, Shauna Thomas, commented "Anyways, thoughts and prayers. Or whatever," alongside a photo of Kirk and a quote from him rejecting the notion of empathy. *Id.* ¶ 16. Santos commented on Thomas' post, "ayyyyyy. Coming in HOT with this one." *Id.* ¶ 17. In response, Thomas said, "It's almost like his words are coming back to haunt him and I love that for him." *Id.* ¶ 18. Santos then replied, "It's really some crazy irony. It's very telling about the vibes one puts out into the world." *Id.* ¶ 19.

The same day, also on her personal, private Facebook page, Santos shared a

post from the page Feminist News. The post was an image of Kirk with text stating, "Let's make one thing clear from the start: Charlie Kirk was the victim of a shooting in a country where he, along with other right-wing extremist influencers, have been inciting violence for years. Kirk is neither a martyr nor a hero; he is a cause." The post also said, "Charlie Kirk, the anti-immigrant, antiabortion, anti-women's rights, anti-anything-human-rights, very racist and islamophobic right-wing activist, Trump ally, and executive director of Turning Point USA, has died after being shot in the neck on Wednesday while speaking at a university campus event in Utah, President Trump has confirmed." Santos commented "Ten toes down [shrug emoji] feel free to delete me [okay hand emoji].", meaning standing firm in her beliefs. *Id.* ¶¶ 21-24. On the same post, comments were exchanged between Santos and a childhood acquaintance, where Santos made clear that she did not condone the killing or wish any harm or violence on Kirk or anyone else and considered him a victim, rather than a martyr or hero. *Id.* ¶ 25.

On September 18, 2025, after receiving an anonymous letter complaining about Santos's Facebook commentary, Defendant Darla Ferguson suspended Santos without pay "pending investigation of [her] recent social media posts regarding Charlie Kirk." *Id.* ¶ 26. A few days later, on September 23, 2025, Sergeant Ricky Carswell, from EFSC's security department, produced a memorandum summarizing his alleged findings on Santos's posts. *Id.* ¶ 28. These findings were limited to confirmation of Santos's employment, that the posts were not available publicly, and that, in his opinion, the posts were "disgraceful in that

they give the appearance of condoning the assassination of Charlie Kirk." He made no findings related to disruption or potential disruption of EFSC's operations. *Id.* ¶¶ 28-30.

On or about October 15, 2025, Ferguson produced an "Outcome of Investigation" memorandum, claiming that "Santos appears to condone if not celebrate the death of Charlie Kirk." *Id.* ¶ 31. The next day, Ferguson issued a termination letter, with similar but expanded language, stating Santos's comments "appeared to condone if not celebrate the death of Charlie Kirk." Ferguson wrote that these comments were "repugnant, divisive, political in nature, and undermined public confidence in EFSC's ability to provide an educational environment free from discrimination based on political affiliation." And accused Santos of "condoning or celebrating an act of gun violence occurring on a college campus." *Id.* ¶¶ 32-34.

Ferguson's statements make clear that Santos was terminated because EFSC disagreed with and disapproved of comments Ferguson made as a private citizen on a matter of public concern. Santos's comments were wholly unrelated to her job duties as a grant accountant. And the record illustrates Defendants' selective retaliation is based on content and viewpoint discrimination. Numerous EFSC employees, including Sgt. Carswell, publicly identify themselves as EFSC employees on Facebook, and some have posted inflammatory political content. *Id.* ¶¶ 39-41. Yet none have faced consequences, let alone termination of their employment. *Id.*

Not only did Santos lose her job, but she also deleted her Facebook account and no longer feels comfortable expressing her political views on the platform. *Id.* ¶ 35. Defendants' actions caused Santos financial loss, emotional distress, reputational harm, and the chilling of her speech. *Id.* ¶ 42.

## LEGAL STANDARD

In reviewing a 12(b)(6) motion to dismiss, "the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff." *Speaker v. U.S. Dep't of Health & Hum. Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). To avoid dismissal, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). It "need not contain 'detailed factual allegations'"; but rather, the allegations must only "'raise a right to relief above the speculative level.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## ARGUMENT

**FERGUSON IS NOT ENTITLED TO QUALIFIED IMMUNITY.**

*a. Legal Standard for Qualified Immunity.*

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (quotation omitted). It "gives government

officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). However, qualified immunity is "not automatic", and the defendant bears the "burden of raising the defense of qualified immunity by proving that he was acting within his authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018). To determine whether a public official is acting within the scope of their discretionary authority, courts ask "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

If an official proves that they were acting within their authority, the burden shifts to the plaintiff to demonstrate "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Jarrard*, 115 F.4th at 1323 (quotation omitted). By asserting qualified immunity in the Motion, Ferguson is limited to the facts as alleged in the Complaint, viewed in the light most favorable to Santos. *See Jackson v. City of Atlanta, Georgia*, 97 F.4th 1343, 1355 (11th Cir. 2024).

Although the Eleventh Circuit previously required precedential cases with "materially similar" facts, the Supreme Court rejected such a "rigid gloss on the qualified immunity standard." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1185 (11th Cir. 2009) ("There need

not, however, be a prior case wherein 'the very action in question has previously been held unlawful.'") (quoting *Hope*, 536 U.S. at 741). While "clearly established law should not be defined at a high level of generality," a "case directly on point" is not required. *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curium) (citations omitted). Instead, the "salient question" is "whether the state of the law" gave the defendant "fair warning" that the action was unconstitutional. *Hope*, 536 U.S. at 741. There are three ways to establish that a defendant had "fair warning": (1) "a materially similar case has already been decided", (2) "a broader, clearly established principle that should control the novel facts of the situation", or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

> b.  *Legal Standard for an Employee's First Amendment Claim.*

"[C]itizens are not deprived of fundamental rights by virtue of working for the government." *Connick v. Myers*, 461 U.S. 138, 147 (1983). As such, an employee's "exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 574 (1968). If the employee's speech was protected, the question a court must consider is whether the government "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

In determining whether an employee's speech was protected, courts first ask whether the employee was speaking as an employee or as a citizen on a matter of public concern. One speaks as an employee when "the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 424). "The court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987)). "The arguably inappropriate or controversial nature of the speech at issue is not relevant to the question of whether that speech involves a matter of public concern." *Darlow v. Babineck*, No. 21-13020, 2022 WL 15345444, at *2 (11th Cir. Oct. 27, 2022) (citing *Rankin*, 483 U.S. at 387).

If the employee spoke as a citizen on a matter of public concern, their free speech rights are balanced against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Bryson*, 888 F.2d at 1565 (quoting *Pickering*, 391 U.S. at 568). "The State bears a burden of justifying the discharge on legitimate grounds." *Rankin*, 483 U.S. at 397 (citing *Connick*, 461 U.S. at 150). "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Id*. at 384.

To determine whether, and the extent to which, an employee's speech impacted the State's interest in "effective and efficient fulfillment of its responsibilities" to the public, courts consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Labriola v. Miami-Dade Cnty.*, 142 F.4th 1305, 1309-10 (11th Cir. 2025) (quoting *Rankin*, 483 U.S. at 388).

Lastly, the employee has the burden to show that the speech at issue played a substantial part in the adverse action, i.e., that it was a "motivating factor". *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Warren v. DeSantis*, 90 F.4th 1115, 1128 (11th Cir. 2024), opinion vacated and superseded on other grounds, 125 F.4th 1361 (11th Cir. 2025). If that is the case, the government has the burden to show that it would have made the same decision even without the protected speech. *Id.*

c. *A Materially Similar Case Gave Ferguson Fair Notice.*

To assert qualified immunity, Ferguson bears the burden of proving that she was performing a legitimate job-related function through means within her authority. She makes no attempt to do so. Instead, she relies solely on the Complaint's allegation that she was acting under color of law. Dkt. No. 16 at 13 (quoting Dkt. No. 1 ¶¶ 9, 10).

Assuming *arguendo* that Ferguson has met her burden in proving that she was acting within her authority, this is not a case where a government official made "reasonable but mistaken judgments about open legal questions." *Lane*, 573 U.S. at 243 (quoting *Ashcroft*, 563 U.S. at 743). Ferguson is not entitled to qualified immunity because *Rankin v. McPherson* is one of several materially similar cases that provide fair notice that her actions violated clearly established law that prohibits the termination of a public employee's employment based on disapproval of their protected speech.

In 1987, the Supreme Court decided that a constable violated a clerical employee's First Amendment rights by firing her for saying to a colleague, at work, "if they go for him again, I hope they get him" after hearing news of an attempted assassination of the U.S. President. *Rankin*, 483 U.S. 380 (1987). Here, Ferguson violated a grant accountant's First Amendment rights by firing her for remarks she made to a colleague on her private social media page in the aftermath of the assassination of a political figure, finding that her speech "appeared to condone if not celebrate the death of Charlie Kirk". Dkt. No. 1-5 at 2. In *Rankin*, another colleague overheard the comment and reported it to the constable. 483 U.S. at 381. Here, someone who Ferguson speculates could be a colleague or member of the EFSC community, saw the online exchange and anonymously reported it to Ferguson. Dkt. No. 1-5 at 2, n.3. In *Rankin*, the constable confirmed that the employee had made the comment, then fired her. 483 U.S. at 382. Here, Ferguson confirmed that Santos had made the comment, then fired her. Dkt. No. 1-4 at 1.

Ferguson cannot distinguish *Rankin* on the grounds that the comments here were made on Santos's social media page. First, the comments were private – only visible to those friends and acquaintances Santos allowed to view her page. Dkt. No. 1-3 at 2. Second, the Supreme Court has been clear that the First Amendment applies to discussions on the Internet, identifying it, and "social media in particular" as "the most important places [] for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (identifying Facebook as a place "users can debate religion and politics"); *see also O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (finding social media policy facially overbroad where it prohibited "content that could be reasonably interpreted as having an adverse effect upon [agency] morale, discipline, operations, the safety of staff, or perception of the public."); *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 193 (2021) (finding school violated a student's First Amendment rights when it disciplined her for "vulgar" criticisms of the school made on social media platform Snapchat).

Ferguson cannot dispute these clearly established principles laid out in *Pickering-Connick* and applied specifically to employee political commentary about assassinations by *Rankin*. She wrote in Santos's termination letter, "As an EFSC employee, you have First Amendment rights just like anyone else, provided the exercise of those rights does not impede EFSC's ability to effectively and efficiently execute its responsibilities as a public institution of higher education[.]" Dkt. No. 1-5 at 1.

### d. *Ferguson Violated Santos's Free Speech Rights*.

This case presents a simple application of *Pickering-Connick*. Santos spoke on a matter of public concern when she weighed in on a debate over the legacy of a political figure whose controversial public statements sparked adoration from some and contempt from others. Ferguson agreed, characterizing the comments as "political in nature". Dkt. No. 1-5 at 2. Santos spoke as a citizen on a matter of public concern – her comments on Kirk's death and legacy did not owe their existence to her employment as a grant accountant at EFSC. Ferguson fired her for those comments, which EFSC found "repugnant." *Id.*

The question turns on a balancing of the parties' interests. As to the comments' impact to EFSC's interest in effective and efficient fulfillment of its responsibilities, Ferguson provides only conclusory statements that the comments "undermined public confidence in EFSC's ability" to provide a "safe learning and working environment" "free from discrimination based on political affiliation" and thereby the comments "impeded EFSC's ability to fulfill its mission." *Id.* But, especially given her role, Santos's comments had no impact on EFSC's ability to provide such an environment, and no disruption justifies her termination.

### e. *Dismissal on Qualified Immunity Grounds is Inappropriate*.

The only dispute presented in the Motion is the balancing of Santos's right to free speech against an alleged impact to EFSC's interest in effective and efficient fulfillment of its responsibilities. Ferguson relies on her own conclusory statements in terminating Santos; Santos alleges those statements were pretextual

and that no disruption to EFSC occurred. Dkt. No. 1 ¶ 50. Claims of qualified immunity involving *Pickering* balancing are seldom determinable on a motion to dismiss, as discovery is necessary. *See, e.g.*, *Devlin v. Kalm*, 531 F. App'x 697, 707 (6th Cir. 2013); *Delgado v. Jones*, 282 F.3d 511, 518 (7th Cir. 2002); *McVey v. Stacy*, 157 F.3d 271, 279 (4th Cir. 1998).

In this case, however, EFSC's justifications for the termination are frivolous, enabling this Court to determine that Ferguson is not entitled to qualified immunity. *See Darlow v. City of Coral Springs*, No. 21-CIV-60083-RAR, 2021 WL 3514826, at *4 (S.D. Fla. Aug. 10, 2021), aff'd sub nom. *Darlow v. Babineck*, No. 21-13020, 2022 WL 15345444 (11th Cir. Oct. 27, 2022); *Brown v. Young*, No. 4:25CV419-MW/MJF, 2025 WL 3640389, at *2 (N.D. Fla. Dec. 16, 2025) (finding no qualified immunity where agency statements characterized employee's comments as "hateful" and violative of zero-tolerance policy). Insofar as additional facts are necessary to determine whether, or the extent to which, EFSC's interest in effective and efficient fulfillment of its responsibilities was impacted, this Court should defer a decision on qualified immunity until discovery is complete.

Ferguson argues that Santos's comments deserve less weight in *Pickering* balancing for three reasons: (1) three people finding her speech objectionable, (2) Santos's comments were not political speech, and (3) EFSC took nearly a month to fire Santos and conducted investigations. Dkt. No. 16 at 16–18.

Santos's comments are no less protected because some disapproved of them. Courts have been clear that speech does not lose its constitutional protection by

virtue of being offensive to some. *See, e.g.*, *Rankin*, 483 U.S. at 387; *Darlow*, 2022 WL 15345444, at \*3 (denying qualified immunity as to the issue of a Facebook meme depicting George Floyd with pink skin being speech on a matter of public concern).

Time, place, and manner can be considered in *Pickering* balancing to determine whether an employee's ability to do their job was impacted by their speech. Time, place, and manner can impair harmony among coworkers and harm close working relationships that require personal loyalty and confidence, thereby disrupting the work at hand. *See Labriola*, 142 F.4th at 1310-11. Publicly insulting the people one works with, for example, can impede one's ability to continue to work with them or infuse an otherwise protected statement on an issue of public concern with an element of personal interest. *See Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276 (11th Cir. 2006); *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1324 (11th Cir. 1989). Here, neither the anonymous report, nor the disapproval from two EFSC employees not involved in Santos's day-to-day duties support a finding of disruption. *Cf. Waters v. Churchill*, 511 U.S. 661, 677 (1994) (explaining that courts must consider the "reasonableness of the employer's conclusions").

While Ferguson now argues that Santos's speech was not political, Dkt. No. 16 at 17, she objected to it precisely because Santos's comments were "political in nature". Dkt. No. 1-5 at 2. Ferguson cites a Tennessee district court case, *Shirinian v. Plowman*, for the premise that comments that "did not specifically engage with Charlie Kirk's politics or his political message" were not political speech. No. 3:25-

CV-528-KAC-JEM, 2025 WL 3680503, at *3 (E.D. Tenn. Dec. 18, 2025). Here, Santos did engage with Kirk's politics and political message, reminding her audience of Kirk's political views on various topics. Dkt. No. 1 ¶¶ 15-17, 22-23. Regardless, speech critical of "public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large" is a natural part of the "robust political debate encouraged by the First Amendment", even when it does not explicitly engage with their political messages. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (finding that "parody" advertisement featuring Jerry Falwell, a well-known political leader, stating that "his 'first time' was during a drunken incestuous rendezvous with his mother in an outhouse" was political speech).

Ferguson contends that some consideration should be given in *Pickering* balancing to the notions that EFSC conducted an "investigation" and that it took nearly a month to terminate Santos for her speech; but the Motion cites no caselaw for this premise and ignores the fact that EFSC immediately suspended her without pay. Dkt. No 1 at 27. Ultimately, the record illustrates that EFSC's justification for Santos's termination was based on (1) a few responses from an unknown source and persons unrelated to her role at EFSC who found her comments objectionable, and (2) conclusory, unfounded statements that her "comments impeded EFSC's ability to fulfill its mission" and "undermined public confidence in EFSC's ability to provide a safe learning and working environment". Dkt. No. 16 at 17 (quotations omitted).

It is clearly established law that neither of these justifications is sufficient to overcome First Amendment protections. Speech, especially political speech, does not lose its protection by offending people. *See Rankin,* 483 U.S. at 390; *Hustler Mag., Inc.,* 485 U.S. at 55; *Oakes Farms Food & Distribution Servs., LLC v. Adkins*, 154 F.4th 1338, 1348 (11th Cir. 2025) ; *Darlow*, 2022 WL 15345444, at *2; *see also, Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). Ferguson's unsupported statements of the comments' impacts on EFSC do not amount to the level of impact to EFSC's efficient and effective fulfillment of its duties that could outweigh Santos's constitutionally protected free speech rights. *See Stough v. Gallagher*, 967 F.2d 1523, 1529 (11th Cir. 1992) (denying qualified immunity where sheriff's claim that employee's speech detrimentally impacted close working relationships requiring personal loyalty and confidence were contradicted by the facts). Unlike *McCullars v. Maloy*, for example, there is no evidence of disharmony among coworkers or a disruption of the office that required diversion of resources. 369 F.Supp.3d 1230, 1240-41 (M.D. Fla. 2019).

As illustrated by *Oakes Farms*, to be considered in *Pickering* balancing, a misalignment of values or opinions must be relevant to some aspect of the employee's work. *See* 154 F.4th 1346-48. The Eleventh Circuit explained that while the school district could terminate Oakes Farms's *food service contract* because the contractor's expressed views on COVID-19 raised concerns about its ability to

provide the contracted services, such fear would likely be irrelevant to a contract for software. *Id*. Further, despite evidence of public backlash to the contractor's public statements on Black Lives Matter and George Floyd, the Eleventh Circuit admonished the district court for relying on concerns that the contractor's speech "contradicted the messages of inclusion and anti-racism that the school district was promoting to its students" as "plainly irrelevant to his company's food service role." *Id*. The court explained that "if there were evidence of retaliation against Oakes because of his views on Black Lives Matter or George Floyd, that would be completely out of bounds." *Id*.

Here, a grant accountant sharing her personal views on a controversial public figure's death and legacy is irrelevant to her ability to provide grant accounting services to a college. It is also irrelevant to EFSC's ability to provide a safe learning and working environment free of political discrimination. On the contrary, terminating an employee for their political speech, particularly because of the content and viewpoint of their speech, is inconsistent with ensuring a working environment free from political discrimination.

Contrast this with, for example *Labriola*, where the commission media aide whose "off-color opinion piece" criticizing a pending anti-discrimination bill led to evidence of disharmony among coworkers, a detrimental impact on close working relationships, along with "ample evidence" of interference with the commission's regular operation, including an unprecedented influx of calls that prevented the office's "day-to-day operations". *Labriola*, 142 F.4th at 1309–11. Further

illustrating that more than disagreement motivated Labriola's termination, it was only after the media aide repeatedly refused training on the county's anti-discrimination policy that he was terminated. *Id.* at 1308. Similarly, in *Oakes Farms*, it was only after the food service contractor failed to provide assurance that it was taking safety precautions in the performance of its duties that the school district terminated the contract. 154 F.4th at 1342.

Given that there is no relevant uncertainty in the law that could justify qualified immunity, Ferguson points to others' actions in the aftermath of Kirk's death. Dkt. No. 16 at 21–22. But even if the court was not limited to the Plaintiff's complaint when considering a motion to dismiss, and even if others' actions, rather than precedential caselaw, could somehow justify Ferguson's actions, government employers, unlike private employers, are bound by the First Amendment when seeking to discipline their employees for their speech.

Ferguson had fair notice that her actions were unconstitutional. She was not facing open questions of law. She fired Santos because she falsely claimed her comments "appeared to condone, if not celebrate" a public figure's killing, despite *Rankin* finding a First Amendment violation in a materially similar case. Beyond *Rankin*, she had the benefit of nearly 60 years of precedent that the government violates its employees' First Amendment rights when it fires them based on objections to their personal comments on issues of public concern, unless its ability to do its work was impacted. Yet rather than inquire into whether, and the extent to which Santos's, or EFSC's, work had been impacted, Ferguson summarily

concluded that an employee making such a "repugnant" comment impeded EFSC's ability to perform its mission. Ferguson is not entitled to qualified immunity for violating Santos's constitutionally protected rights.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Defendant's motion to dismiss in its entirety.

Dated: January 30, 2026

Respectfully submitted,

/s/ *Ryan D. Barack*
Ryan D. Barack
Florida Bar No. 0148430
rbarack@employeerights.com
Jackie@employeerights.com
Michelle Erin Nadeau
Florida Bar No. 0060396
mnadeau@employeerights.com
Jackie@employeerights.com
Kwall Barack Nadeau PLLC
304 S. Belcher Rd., Suite C
Clearwater, Florida 33765
(727) 441-4947
(727) 447-3158 Fax

/s/ *Samantha J. Past*
Michelle Morton (FBN 81975)
Caroline A. McNamara (FBN 1038312)
Samantha J. Past (FBN 1054519)
Daniel B. Tilley (FBN 102882)
ACLU FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-1082
mmorton@aclufl.org
cmcnamara@aclufl.org
spast@aclufl.org
dtilley@aclufl.org

*Attorneys for Plaintiff*